Charles A. HALLMARK, Appellant,

v.

Don E. HAND, et al., Appellees.

No. 13-91-241-CV.

Court of Appeals of Texas, Corpus Christi.

May 28, 1992.

Rehearing Overruled July 30, 1992.

Edwin I. McKellar, Jr., Wiley Doran, Mitchell & Doran, Houston, for appellant.

Andrew McStay, Andrew, Stay & Associates, Tom Alexander, Kevin McEvily, Houston, for appellees.

Before NYE, C.J., and GERALD T. BISSETT[1] and SEERDEN, JJ.

## OPINION

GERALD T. BISSETT, Assigned Justice.

The trial court rendered a take-nothing judgment in a suit in which the plaintiff, Charles A. Hallmark, sought to recover actual and exemplary damages for breach of contract, negligence, breach of duty to deal fairly and in good faith, and financial losses caused by defendants. Don E. Hand and Greenwood Properties, Inc.[2] We reverse and remand.

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

2. The record does not show that Greenwood Properties answered or participated in the trial;

yet, judgment was rendered that Hallmark take nothing from Hand and Greenwood Properties. Hallmark has appealed. All parties to this lawsuit, as well as the trial judge, treat this cause as a controversy strictly between Hallmark and

## FACTS

Hand owned all of the stock of Greenwood Properties, and was also the major stockholder of the Chasewood Bank, hereinafter referred to as the "Bank." He was also chairman of the board of directors of the Bank. Both Hallmark and Hand were initial stockholders in the Bank. Additionally, Hand was one of the Voting and Stock Agreement voting representatives, which restricted the sale of Bank stock. Hallmark needed to dispose of his stock in the Bank, and in accordance with a requirement of the Voting and Restriction Agreement, contacted Hand about selling it.

Hand obtained a written form from the Bank and prepared a letter, addressed to him, which Hallmark signed and Hand "accepted." The letter, dated August 19, 1986, together with Hallmark's signature and Hand's acceptance and assignment, stated:

> Through this letter and with your acknowledgement below, I hereby contractually agree to sell to you, or to [your] assigns, *Fifty Seven Thousand Eight Hundred Ninety Two (57,892)*, shares of the Chasewood Bank common stock for the total consideration of *Three Dollars and 85/100* —— Dollars (*$3.85 per share*). This sale shall be consummated on or before 30[3] days from the date hereof. I further understand that there may be certain pre-emptive rights to purchase additional shares of Chasewood Bank common stock granted at the August 19, 1986, shareholders meeting. Should the record date for ownership to acquire new shares predate the consummation of this sale, said pre-emptive rights accumulated heretofore or hereafter shall pass to the purchaser of the above referenced shares, in full, with no additional payment of any kind. This transaction is subject to approval by regulatory authorities, not to exceed thirty (30) days.[4]

> Sincerely,
> S/Charles A. Hallmark
> I hereby acknowledge and accept this contract, subject to the approval by the Voting and Stock Restriction Agreement voting representatives.
> S/Don E. Hand
> I hereby assign the above contract to Greenwood Properties, Inc. without recourse.
> S/Don E. Hand

The transaction was never consummated, and Hallmark instituted suit against Hand and Greenwood Properties to recover damages for breach of contract, breach of duty to deal fairly and in good faith with him, negligence in failing to obtain the approval of the regulatory authorities for Hand's purchase of the stock, and for financial losses he sustained as a result of Hand's refusal to purchase the stock.

Hand answered by general denial, and after the evidence was in and the parties had closed, Hand, with permission of the trial court and over Hallmark's objection, filed a trial amendment to his original answer in which he specially denied that all conditions precedent to the obligations of the contract regarding regulatory approval have been completed or fulfilled, specifying that regulatory approval was not received within 30 days.

At a special meeting on August 19, 1986, the Bank's shareholders authorized an increase of capital by the issuance of an additional 800,000 shares of stock, to be sold at $1.60 per share, and to issue preemptive rights, pro rata, to enable the stockholders to buy the new stock. At that time, Hand owned 48–49% of the then-outstanding stock and had represented to the FDIC that all of the 800,000 shares would be bought, even if he "had to buy them all." Hand desired to get control of the Bank, and believed that he needed about 50,000 more shares to do so. However, to

Hand, to the exclusion of Greenwood Properties. We do likewise.

**3.** The form read "ten" days, which was changed to read "30" days and initialed by both Hallmark and Hand.

**4.** Hand added the last sentence after Hallmark had signed the letter, and Hallmark accepted the addition.

acquire more than 50% of the Bank stock, he must first receive approval of the Texas Department of Banking to buy the stock necessary to exceed the 50% limit. Hand applied for approval on September 17, 1986, and the Texas Department of Banking approved the application on September 29, 1986.

Hallmark made demand on Hand by letter dated September 30, 1986, that he "consummate this transaction within 5 days from receipt of this letter by remitting a cashier's check in the amount of $228,-884.20". Hand refused to pay.

Hand's attorney wrote Hallmark on October 22, 1986, and stated:

> Specifically, I direct your attention to the fact that my client's obligation under the August 19, 1986 letter was contingent upon receipt of regulatory approval by September 19, 1986. Since this was not obtained, my client has no obligation under the August 19, 1986 letter.

Suit was filed in December of 1986.

After a bench trial, the court rendered judgment on December 29, 1990, that Hallmark take nothing in his suit against Hand and Greenwood Properties.

The trial court found in its findings of fact:

1. The August 19, 1986 letter addressed to Defendant Don E. Hand by Plaintiff Charles A. Hallmark is a mere offer to sell;
2. Neither Don E. Hand nor Greenwood Properties, Inc. made any agreement to purchase Chasewood Bank Stock from Charles A. Hallmark;
3. At the time he signed the August 19, 1986 letter, acknowledging and accepting it, Don E. Hand did not intend to be bound to purchase Chasewood Bank stock from Charles A. Hallmark. By taken (sic) the assignment of such letter, Greenwood Properties, Inc. likewise did not intend to be so bound;
4. The August 19, 1986 letter was not materially altered after it was signed;
5. There was no legal benefit which flowed to Don E. Hand or Greenwood Properties, Inc., or legal detriment imposed upon Charles A. Hallmark in

exchange for the letter of August 19, 1986;

6. Regulatory authorities did not approve of Don E. Hand acquiring the subject Chasewood Bank stock within thirty (30) days of August 19, 1986; and
7. Neither Don E. Hand nor Greenwood Properties, Inc. conspired to nor interfered with the process of regulatory approval, nor was either of them negligent with respect to any duty that may have been owing to Charles A. Hallmark.

The trial court concluded as a matter of law:

1. Neither Don E. Hand nor Greenwood Properties, Inc. breached any agreement with or any obligation to Charles A. Hallmark;
2. Neither Don E. Hand nor Greenwood Properties, Inc. acted in bad faith towards Charles A. Hallmark; and
3. Any loss suffered by Charles A. Hallmark as a result of not having sold his Chasewood Bank stock is not the fault of either Don E. Hand nor (sic) Greenwood Properties, Inc.

## POINTS OF ERROR

Points of error 1 and 3 read:

### Point of Error No. 1

The Court erred in its findings of fact numbers 1, 2, 3 and 5, and conclusions of law numbers 1 and 3 that the letter of August 19, 1986, created no contract as the evidence and law conclusively establish that a binding contract supported by consideration was formed, breached, and damages were sustained. Alternatively, the Court's findings are so against the great weight and preponderance of the evidence as to be manifestly unjust.

### Point of Error No. 3

The Court erred in its finding of fact number 6 that regulatory authorities did not approve of Don E. Hand acquiring the subject Chasewood Bank stock within

thirty days (30) days of August 19, 1986, because under the terms of the contract the approval, which was obtained, need only be granted within thirty days of the date of filing of the application for approval.

First, we determine whether the letter of August 19, 1986, was a contract or a mere offer to sell. Hallmark argues that if it is not an express contract, then it is an implied contract.

■ Courts of this State have long recognized that the real difference between express contracts and those implied in fact is in the character and manner of proof required to establish them. *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex.1972). In each instance there must be shown the element of material agreement, which, in the case of an implied contract, is inferred from the circumstances. *Marr–Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm'n App.1928, judgment adopted). "The conception is that a meeting of the minds of the parties is implied from and evidenced by their conduct and course of dealing, the essence of which is consent to be bound." *Haws & Garrett*, 480 S.W.2d at 609.

The Court, in *Allen–Morrow Co. v. Liquid Carbonic Co.*, 27 S.W.2d 132 (Tex. Comm'n App. 1930), stated,

A contract implied in fact, or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract.

*Id.* at 135.

It is stated in 14 Tex.Jur.3d *Contracts* § 135:

Mutuality may be present in a contract by virtue of the existence of an implied obligation on the part of a party to the agreement. Although a contract by its express terms may appear to be obligatory on one party only, nevertheless if it is clear that it was the intention of the parties, in view of the consideration on which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, the obligation will be implied and the contract held to be mutual. This is true, for instance, where the act to be done by the party expressly binding himself can be done only if a corresponding act is done or allowed by the other party.

The Supreme Court of Texas laid down the following rule in *Freeport Sulphur Co. v. American Sulphur Royalty Co.*, 117 Tex. 439, 6 S.W.2d 1039 (1928):

The court cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties in the contracts made. Before a covenant will be implied in the express terms of a contract, it must appear therefrom that it was so clearly in the contemplation of the parties as that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to imply such covenant in order to give effect to and effectuate the purposes of the contract as a whole....

*Id.* at 1040–1041.

■ The fact that one party signed the document and the other party accepted it, though not conclusive, tends to show that the parties contemplated a contract of sale rather than a mere offer to sell. *Rafael Gutierrez del Arroyo v. Graham*, 227 U.S. 181, 184, 33 S.Ct. 248, 250, 57 L.Ed. 472 (1913); *Hart v. Ehlers*, 319 S.W.2d 418, 425 (Tex.Civ.App.—Houston 1958, no writ). Likewise, the use of the word "contract" in connection with Hand's acceptance and in his assignment to Greenwood Properties, shows that both parties recognized the letter agreement as a contract. The document, when read in its entirety, shows that the parties intended to impose a promise to pay by Hand if regulatory authorities

approved the stock purchase. *See Gutierrez del Arroyo,* 227 U.S. at 184, 33 S.Ct. at 250.

█ The intention of the parties is gathered from the language they used in drafting the document and not from the secret intentions or suppositions of one of them. *Emmord's Inc. v. Obermiller,* 526 S.W.2d 562, 565 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.); *Magnolia Petroleum Co. v. Storm,* 239 S.W.2d 437, 440 (Tex.Civ.App.—El Paso 1950, writ ref'd n.r.e.).

Hand testified that he did not intend to buy the stock at the time he and Hallmark signed the letter agreement.[5] However, this is contrary to certain statements his attorney made in a letter to Hallmark, dated October 2, 1986, the pertinent part of which is quoted above, and the letter by his attorney to Hallmark, dated October 17, 1986, which said:

> Please be advised that Mr. Hand has not "... wholly failed and refused to comply with the terms of his agreement to purchase the stock as hereinabove described." In fact as both you and your client are well aware the contract required regulatory approval before Mr. Hand would be required to purchase Mr. Hallmark's stock. Said regulatory approval was to be obtained within thirty days from the date of their agreement or by September 19, 1986. Hallmark's stock was not received within the thirty day period and theretofore Mr. Hand has no contractual obligation whatsoever to Mr. Hallmark in regard to the purchase of this stock.

Concerning the terms of the Voting and Stock Subscriptions Agreement, Hallmark testified that when a stockholder in the Bank desired to sell some, or all, of his stock, he was required to notify one of the "voting representatives" of such desire. Hand was one of the voting representatives on August 19, 1986. Hallmark further testified that on at least fifteen occasions in the past, he had notified the voting representatives in writing for authority to sell some of his stock to third parties if the voting representatives did not want to exercise their options to buy, as provided in the Voting and Stock Subscription Agreement. This testimony was uncontradicted. He also testified that on July 15, 1986, he sent Hand a letter advising that he wished to sell all of his stock in the Bank for $5.85 per share, and that on August 18, 1986, he "called" Hand and asked him if he had received the letter, and that "Hand indicated that he had." Hand denied this. Hallmark then stated that Hand told him that he would attend a special meeting of the stockholders of the Bank the next day and "we'll talk further about it." As already noted, a special meeting of the stockholders was held on August 19, 1986, to increase the Bank's capital stock by 800,000 shares, thereby increasing the capital stock from 1,200,000 shares to 2,000,000 shares. The proposal to increase the stock was authorized. Hallmark and Hand talked about Hallmark's desired sale of all of his stock immediately after the meeting. According to Hallmark's testimony, Hand said, "I'll give you $3.00 or $3.50 a share." Hallmark, who owed $208,000 to the Allied Champions Bank, told Hand, "I can't take that because it won't pay off my notes at Allied Champions Bank." Finally, Hallmark said, "We agreed upon a price of $3.85." Hallmark further testified:

Q. Did you have any other conversations with Mr. Hand concerning this matter at that time?

A. Yes, we did. During the negotiation process, Mr. Hand indicated to me that I should be able to take less than $3.85 because I had one note secured by real estate, by a lot. It was a lien I had taken, and I had put it up as security. And, so, I wanted him to know I wanted to pay off the obligations I had; and I was emphatic about it, that it was a must in my instance. I had to pay them off.

---

5. If he did not intend to buy the stock, then why did he go to the trouble of having one of the Bank's employees prepare the letter and why did he prepare the necessary application for approval which was submitted to the regulatory authorities?

Q. And how much did you figure you needed in order to pay off these obligations?

A. I needed at least $208,000 to pay off all of them, and $222,000 would give me a balance, to me, about $14,500.

Q. And I think you said you agreed to $3.85, and that would produce the $222,000 figure?

A. Yes, sir.

\* \* \* \* \* \*

Q. Was there any conversation concerning the Voting and Stock Restriction Agreement?

A. Yes, sir, that came up in our discussion. It had already been discussed. My letter had been discussed.

Q. Discussed by whom?

A. By members of the Voting and Stock Restriction Agreement and that he already had approval to buy my stock.

Q. Was there any discussion concerning any approval by the State?

A. Not at the point, no, sir.

With respect to the last sentence of the August 19, 1986, letter, according to Hallmark, when Hand asked Mr. Fred Allen, a Bank officer, if he would have to file a written application with the Banking Department, Mr. Allen said, "Yes, sir. We're going to have to file it, and the Banking Commissioner has 30 days from receipt to act upon your application," whereupon Hand turned to the secretary and said, "Type that last sentence in there in that second paragraph."

Hallmark then told the court, "Mr. Hand indicated to me—he says, I'll go ahead and buy you out at $3.00 per share," and that he, Hallmark, said:

"Well, Mr. Hand, how can you buy me at $3.00 a share when you're saying you need the Banking Department's approval?" and I said, "Why couldn't you go ahead and pay the $3.85?"

He said, "Well, I'm not going to gamble on that." He said, "What I will do, I will buy the stock myself in somebody else's name, some other person's name."

And I said, "Well, I can't afford to sell at $3.00 a share."

Hallmark also testified:

Q. All right. What was the other discussion from Mr. Hand?

A. He indicated to me that we should—and it was a joint agreement—that we should handle the transaction over at the Allied Champions Bank and that I should deliver my stock to Charles Friday, Chairman of the Board of Allied Champions Bank. That he would remit the money to the Allied Champions Bank to pay off my notes, and the difference would be placed in my checking account. And I told him I would go ahead and do that.

\* \* \* \* \* \*

And then I signed about 46 or 47 stock assignment forms, giving Mr. Friday the power of attorney to transfer all of my stock over to Mr. Hand upon Mr. Hand remitting $222,884.20 to Allied Champions Bank.[6]

Hallmark testified to additional conversations with Hand about Hand's offer to buy all of the stock at $3.00 per share without Banking Department approval, which offer he refused.

At a meeting on October 31, 1986, the Bank directors voted to allocate 101,959 shares of the remaining unsubscribed preemptive stock shares to Hand at a cost of $1.60 per share.

Later, Hallmark went into bankruptcy.

Mr. Fred Allen, a senior vice-president of the Bank at the time in question, testified by deposition. In summary, he stated that on August 19, 1986, he told Hand that if his application to purchase the Hallmark stock was not approved in writing within 30 days, "by statute it was automatically approved;" and that he obtained the necessary forms to apply for approval and he and Ms. Ruth Rowe, Hand's bookkeeper, completed them. He further testified:

We were contemplating Hand's acquisition of control of the bank, whether it be Hallmark stock or anyone else's stock was irrelevant. We determined that it

---

**6.** Mr. Friday gave the stock back to Hallmark in November or December of 1986.

would take approximately 50,000 shares would have give him 51 percent.

He also stated that at that time, Hand calculated that he might need to buy some of the unsubscribed stock (the 800,000 shares) to make the capital infusion.

Considering the record as a whole, it is apparent that Hand knew on August 19, 1986, that it was unlikely that he could obtain approval of the regulatory authorities for him to purchase an amount of stock which would give him more than 50% of the Bank stock within 30 days of that date.

The approval of the voting representatives was timely obtained, and all that remained to be done to consummate the sale was to obtain the approval of the State Banking Department, the regulatory authority. It was impossible to secure such approval within 30 days from August 19, 1986, since the application was not filed until September 17, 1986, some 29 days after August 19, 1986.

Hand testified that his first contact with Hallmark about Hallmark's desire to sell the stock was on August 18, 1986, when Hallmark told him that he wanted to sell his Bank stock. In their discussions, which apparently took place both before and after the stockholder's meeting of August 19, 1986, Hallmark told Hand, according to Hand, "that his stock was mortgaged and for some $3.85 per share, and that was the least he could sell it for." With respect to the stockholders' meeting, Hand testified:

Q. What was the purpose of that meeting?

A. Sir, the primary purpose of the meeting was we had been required to put additional capital into the bank by the FDIC; and the main reason for the meeting was authorizing the sale of additional capital. I think 800,000 shares at $1.60 a share, and that's approximately $1,400,000.

Q. And these shares were offered preemptively to the then present stockholders; is that correct?

A. That's correct.

He further testified that after receipt of the forms for approval by the Banking Department, it took him and his staff several days to answer the questions contained in the application and to furnish the required exhibits.[7] He also said that he did not know on August 19, 1986, that the acquisition of the Hallmark stock would put him over 50% ownership of the Bank stock, but the application "was filed in anticipation of excess of 50 per cent stock ownership."

■ The application for approval of Hand's purchase of additional stock, as filed, did not specifically request approval of the Hallmark shares of stock, but was a general application to cover enough of the unsubscribed stock (the 800,000 shares) which Hand anticipated he might have to buy to control the Bank. Therefore, arguably, the application, as submitted, was for the purchase of some of the Bank's 800,000 share stock offering, and, in that sense, no application for approval of the purchase of Hallmark's stock, as such, was ever submitted. Under those circumstances, we would hold that Hand deliberately failed to seek approval of the proposed purchase of Hallmark's stock, and thus prevented the consummation of the transaction. Every contract contains an implied promise that a party will not do anything to delay or prevent the other party from performing his part of the contract. *See Texas Nat'l Bank v. Sandia Mortgage Corp.*, 872 F.2d 692, 698 (5th Cir.1989). However, we believe that the application, though in general terms, under the circumstances, was broad enough to cover the Hallmark stock purchase, as was the State Banking Department's approval of it.

The Supreme Court of Texas stated in *Hohenberg Bros. Co. v. George E. Gibbons Co.*, 537 S.W.2d 1 (Tex.1976):

[W]here the intent of the parties is doubtful or when a condition would impose an absurd or impossible result then the agreement will be interpreted as creating a covenant rather than a condition

---

**7.** Many of the exhibits existed on August 19, 1986, and much of the information requested

was known on that date.

... Because of their harshness in operation, conditions are not favorites of the law.

*Id.* at 3.

The following rule was announced in *Henshaw v. Texas Natural Resources Foundation*, 216 S.W.2d 566 (Tex.1949):

"Since forfeitures are not favored, courts are inclined to construe the provisions in a contract as covenants rather than as conditions. If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed."

*Id.* at 570.

The Court, in *Home Savings Association v. The Tappan Co.*, 403 F.2d 201 (5th Cir. 1969), confirmed that the law does not favor conditions, and when the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition. It further stated that such proposition has added weight when the condition precedent allegedly stated is peculiarly within the control of one of the contracting parties. Our Supreme Court recently restated these principles in *Criswell v. European Crossroads Shopping Center, Ltd.*, 792 S.W.2d 945, 948 (Tex.1990).

No evidence reveals the date when the request was made to the Banking Department for the necessary forms, nor is there any evidence of the date when Hand received the forms. No evidence shows the exact date that work was commenced on furnishing the information the Banking Department demanded or how long it took to complete the forms from start to finish.

Hand said that he did not offer to buy Hallmark's stock at $3.00 per share. He further said that August 19, 1986, letter was an "offer to help him sell that stock," and not an agreement to buy the stock for himself.

■ Hallmark "contractually" agreed to sell that stock to Hand at $3.85 per share. This was an express covenant. The statement in the letter "this sale shall be consummated on or before 30 days from date

hereof" is a condition precedent to the *consummation* of the contract and is *not* a condition to the *formation* of the contract. The last sentence in the second paragraph required approval by the regulatory authorities, not to exceed 30 days before the purchase price was to be paid. Both provisions should be considered together; one has a date limit and the other does not. If the terms of the letter are strictly constructed, it would be impossible to consummate the contract within 30 days from its date if approval of the purchase of the stock by the regulatory authorities was obtained. The evidence shows that both parties believed on August 19, 1986, at the time when the letter was signed and accepted, that the approval by the regulating authorities could be secured within 30 days from the date of the letter.

■ We conclude that the letter of August 19, 1986, was a contract by which Hallmark expressly agreed to sell the stock to Hand. We further conclude that Hand, since he prepared the letter, and since he had absolute and exclusive control over preparing and filing the application for approval by the Banking Department of Texas, impliedly contracted to buy the stock within 30 days of the approval, by the regulatory authorities (September 29, 1986). Therefore, the trial court erred in finding: "that the letter of August 19, 1986 is a mere offer to sell," in finding that neither Hand nor Greenwood Properties made any agreement with Hand to purchase the stock, in finding that Hand did not intend to be bound to purchase that stock at the time he signed the letter "acknowledging and accepting it," and in finding that no legal benefit flowed to Hand, or legal detriment was imposed on Hallmark "in exchange for the letter." We further conclude that the trial court erred in its conclusion of law that neither Hand nor Greenwood Properties breached any agreement or obligation to Hallmark, or that any loss Hallmark suffered as a result of his not having sold his stock was not the fault of Hand or Greenwood Properties.

Some evidence supports findings of fact Nos. 1, 2, 3, 5, and 6, which precludes our

reversing the take-nothing judgment and rendering judgment for Hallmark. Therefore, we overrule points 1 and 3 with respect to the "no evidence" contentions. However, the findings of fact, above noted, are so against the great weight and preponderance of the evidence that they are manifestly unjust. Therefore, we sustain points 1 and 3 that the findings are against the great weight and preponderance of the evidence.

Hallmark further contends that the trial court erred in sustaining objections to the admission of evidence of Hallmark's bankruptcy expenses (Point No. 6), and of his loss of credit (Point No. 7). Hallmark was asked if he incurred expenses in connection with his bankruptcy. He answered, "Yes, I have." An objection that such testimony was irrelevant was sustained. Hallmark was asked if he was able to get any credit anywhere. The trial court sustained an objection on the grounds of relevancy. Hallmark was allowed to make a bill of exceptions of this and testified to his expenses in bankruptcy and his loss of credit.

The Supreme Court stated in *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687–88 (Tex.1981), that in an action for breach of contract, actual damages may be recovered when loss is the natural, probable, and foreseeable consequence of the defendant's conduct. The court held that actual damages for loss of credit or injury to credit reputation in an action for breach of contract may be recovered when evidence shows that the loss of credit was a natural, probable, and foreseeable consequence of the defendant's breach.

Hand knew of Hallmark's desperate need to sell his stock to pay the Allied Champions Bank notes; he knew of Hallmark's character and reputation and prior association as controller of the Houston school district, chief executive officer of the large teachers' credit union, and Hallmark's general reputation. Consequently, we believe the natural, probable, and foreseeable consequences of Hand's conduct includes damages for interest paid and accrued on the debts owed to Allied Champions Bank, the failure to be able to pay

these debts which forced Hallmark into bankruptcy, his expenses, his loss of credit, and injury to his credit reputation. The offered evidence of the expenses in connection with the bankruptcy, if the bankruptcy resulted from Hand's failure to pay for the stock within 30 days from September 29, 1986, should have been admitted. Points 6 and 7 are sustained.

In view of our holding with respect to points Nos. 1, 3, 6, and 7, we need not consider the remaining points of error, save and except Point No. 8, which asserts that "the court erred in rendering a take nothing judgment and in failing to render judgment for Hallmark." *See* Tex.R.App.P. 90(a). The point, insofar as it contends "that the court erred in rendering a take nothing judgment" is concerned, is sustained. The fact that evidence was excluded concerning the expenses incurred by reason of bankruptcy and loss of credit, if for no other reason, prevents our sustaining the point insofar as it contends that the court erred in failing to render judgment for Hallmark; that portion of the point is overruled.

The judgment of the trial court is reversed and the cause is remanded to the trial court for a new trial.