Filed 2/18/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DAVID ASH, as Trustee, etc., | B237404 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. YC059517) |
| v. | |
| NORTH AMERICAN TITLE COMPANY, | |
| Defendant and Appellant; | |
| RICHARD LERNER, as Trustee, etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger and William G. Willett, Judges. Affirmed in part and reversed in part and remanded.

Samuels, Green & Steel, Orlando F. Cabanday and Frederick H. Choi for Plaintiff and Appellant David Ash, as Trustee.

Richard D. Marks Professional Corporation, Richard D. Marks; Garrett & Tully, Ryan C. Squire and Tammy Chow Weaver for Defendant and Appellant North American Title Company.

Callahan, Thompson, Sherman & Caudill, Robert W. Thompson and George N. Koumbis for Defendant and Respondent Richard Lerner, as Trustee.

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of **part D** of the Discussion.

## INTRODUCTION

Defendant, a seller of real property, breached the real estate sales contract with plaintiff, the buyer, by causing the closing of the escrow to be delayed so that it did not close on the agreed-upon Friday set forth in the contract. The sale was part of an Internal Revenue Code (Title 26) section 1031 (section 1031) transaction to defer the buyer's capital gain tax on the buyer's sale of another property. The buyer had the money payable on his sale of the other property deposited in a segregated account with a section 1031 qualified exchange intermediary (section 1031 intermediary).[1] On the Monday after the sale had been scheduled to close, the section 1031 intermediary closed and then filed for bankruptcy. The bankruptcy court did not release the buyer's money until after it was too late legally to qualify for deferral of taxes under section 1031.

A jury found the seller and the escrow company at fault for the escrow not closing on time—i.e., on Friday—and awarded the buyer damages against the seller for the delay, including the loss of the tax benefits. The jury also found the escrow company liable for breach of fiduciary duty and awarded the buyer damages against the escrow company for losses resulting from the delay in the closing of escrow.

We reverse in part because, as discussed in the published portion of the opinion, (a) there was insufficient evidence the contract damages assessed against the seller based on the bankruptcy were foreseeable and (b), as to the escrow company, the trial court failed to instruct the jury on an intervening and superseding cause—the bankruptcy.

---

[1]    See Department of Treasury Internal Revenue Service Regulations: IRC section 1031, "Definition of Qualified Intermediary," Preamble to Regulations: Deferred Exchange R.23; section 1.1031(k)-1(g)(4) R.34.

## FACTUAL BACKGROUND[2]

Plaintiff David Ash as trustee of the David Ash Trust (Ash), in connection with his sale of commercial real estate that realized a taxable gain, desired to defer the capital gain tax under section 1031[3] by purchasing commercial property from defendant Lerner.[4] On October 8, 2008, Ash and Lerner entered into an agreement by which Lerner agreed to sell to Ash commercial property. Defendant North American Title Company (NAT) was selected to be the escrow company for the purchase, for which escrow opened shortly thereafter, and was scheduled to close on November 21, 2008—the "expected closing date."

Ash was in the real estate business, and, after talking to different brokers, selected LandAmerica Exchange Services (LandAmerica) to receive proceeds from the sale of his property in order to comply with section 1031.[5] When he entered into the agreement

---

[2]    We do not state in detail the facts concerning the liability of the defendants because the issues in the published portion of this opinion involve damages and jury instructions.

[3]    "Under section 1031, no taxable gain or loss is recognized on the exchange of properties of like kind if both the property surrendered and the property received are held either 'for productive use in a trade or business or for investment.' (26 U.S.C. § 1031(a)(1).) This section 'allows taxpayers with profitable real estate investments to swap them for other real estate without paying tax.' (2 Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2009) ¶ 13:305.1, p. 13-58 (rev. #1, 2009)." (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1140, fn. 5.)

[4]    The defendants were Richard and Gloria Lerner, as trustees of the Exemption Trust of the Lerner Family Trust dated November 17, 1986. Also referred to as defendants and owners of the property are Richard and Gloria Lerner, as trustees of the Ray Learner Irrevocable Trust dated December 30, 1992. They are collectively referred to as Lerner.

[5]    Ash originally said he was going to use TIMCOR as an intermediary, "and I think WAMU [Washington Mutual] bought them or something happened, and both of them disappeared or went bankrupt or something. . . . I'm not sure if they went out of business or if they were bought out by Washington Mutual and then Washington Mutual closed them down and then went out of business. But somehow, it was all lumped together, from what I know, or what I was told."

3

with LandAmerica, he had no concerns about its "financial viability." He chose LandAmerica based on "the opinion of the [p]eople [he] spoke to about it." When asked if he was "scared to lose [his] money if he got into a 1031 exchange," he responded "no." Ash was told LandAmerica had various branches and was part of LandAmerica Commercial Services. Ash had used LandAmerica for another replacement property.

At some point during the escrow period after the purchase and escrow agreements were executed, Ash had concerns, "I was afraid of the whole industry everywhere . . . the banking system was, like, collapsing at the time. So -- I also needed income. So I wanted to do something as quick as possible to get my income and also to be protected." He had nevertheless chosen to use LandAmerica, signing the papers on November 13, 2008, over a month after escrow opened, although the paperwork with LandAmerica was dated as of October 9, 2008. He later said that near the closing date he was worried about his money because he wanted the income: "I wanted to get it done." Ash had told NAT that he needed the income from the property he purchased to have the escrow completed because he wanted to have his funds safely reinvested. Ash never said he was concerned at any time specifically about the financial condition of LandAmerica.

Under section 1031, in order to defer paying the capital gains tax on the sale of his other property, Ash was required to close his transaction with Lerner within 180 days of the sale of Ash's property.[6] Ash had the proceeds from the sale of his property on which the escrow had closed deposited with LandAmerica, using an account at Citibank. This was a segregated account that paid a lower interest rate than an account that pooled money from other investors. Ash verified that the funds were in the Citibank account.

Neither Lerner nor NAT had any involvement with the selection of LandAmerica. As noted, the escrow was to close on Friday, November 21, 2008, but it was anticipated

---

[6]    The property being purchased must be identified within 45 days after the sale, and the purchase must take place within 180 days of the sale. (Title 26 U.S.C. § 1031(a)(3).) Up to three potential properties may be identified. (Title 26 U.S.C. § 1031(a)(3).) Section 1031 can be simply a deferral of the capital gains tax if the taxpayer later sells the property he or she acquired.

by both defendants that the escrow would take a few more days to close. When so informed, Ash responded, "no problem do I get a discount[☺] (jk) [just kidding]. Thank you!!" Ash's response expressed no concern about the status of LandAmerica. On Monday, November 24, 2008, LandAmerica froze all of its accounts, including segregated accounts, and then filed for bankruptcy.

Ash's real estate broker was aware of LandAmerica and the number of people who used it. He believed it was a "very substantial company" and a "very large company" and knew of its affiliated companies. He said he told Ash it was a reputable company. Ash's broker said he too was "shocked" and "everybody was shocked" when LandAmerica closed its doors. Ash had expressed no concerns to Lerner or to NAT about the financial solvency of LandAmerica. The escrow officer at NAT who had worked with LandAmerica had no concerns about the solvency of LandAmerica prior to the bankruptcy. She said she was "shocked" upon hearing LandAmerica had closed.

Ash's expert, who once worked for LandAmerica, said it was "unusual," "alarming," and "unique" that LandAmerica closed its doors. She added that escrow holders would not get information about rumors concerning a section 1031 qualified intermediary, and if they did, they would not necessarily inform the principals to escrow accounts of such rumors. She could not say that any such rumors about LandAmerica were generally known by people in the real estate industry in Southern California. There is no evidence that Ash, and more importantly defendants, were aware of any such rumors about LandAmerica. The real estate agents involved, in addition to the escrow officer for NAT, said they were "shocked" and surprised about LandAmerica's bankruptcy. A LandAmerica employee handling the matter said she had been involved in 5000 or more section 1031 exchanges and apparently had no warning of an impending LandAmerica bankruptcy. That LandAmerica employee said, "There was never any doubt until 9:00 a.m. on the morning of November 24 [the date the business closed] that the money would be available." She added that the event was so traumatic that it was even worse than the death of her father—"worse than anything"; "absolutely beyond description." She added, "everybody [at LandAmerica] was very angry and couldn't

5

understand how it could happen." Another LandAmerica employee said she had no awareness of any financial problems with LandAmerica. Ash's real estate agent, who had been in the industry for more than 35 years and involved with section 1031 exchanges, said this was the first one in which a qualified intermediary failed to fund the escrow.[7] Despite Ash's hopes and the fact that the money was in a segregated account, the bankruptcy court refused to allow depositors, including Ash, to have access to their deposited monies.

Ash did not cancel the transaction because he was concerned he might lose his deposits and would be unable to complete the tax-deferred exchange. He continued to pay interest on the bank loan he had taken out to purchase the property without the income from the property to use for loan payments. The bank required Ash to repay the loan after five months because there was no deed of trust recorded to secure the loan. Without income from the property, he was required to borrow money from his mother. He also needed to hire an attorney to attempt to convince the bankruptcy court to release his money in order to complete the transaction.

The escrow did not close until March 2010, after the bankruptcy court finally released Ash's funds. The closing of escrow was too late for Ash to obtain the section 1031 tax deferral of his capital gain taxes.[8]

---

**[7]** LandAmerica apparently failed because it invested its funds in auction rate securities, the market for which collapsed in February of 2008. (See Funk, *So You Thought Your Proceeds Belong To You? The Interplay Between Like-Kind Exchanges Under the Tax and Bankruptcy Codes* (2011) 25 No. 2 Prac. Tax Law 43, 50-51 (Funk). The Chief Operating Officer of LandAmerica told "everybody how great everything was . . . and that he had no idea there was a bankruptcy imminent." He added that the "mother company" "had promised to, if necessary, buy those securities to make the accommodator [1031 intermediary] liquid." He also said that the "mother company" had guaranteed the accommodator funds.

**[8]** Ash, nevertheless, on his tax return treated his sale of property as nontaxable, and then later amended the return to show the gain.

As a result of the delayed escrow and the delay in recovering his funds resulting from the bankruptcy, Ash sued Lerner and NAT for damages, including Ash's legal expenses of $140,000 incurred in the bankruptcy proceeding and tax liability of $465,000 due to the failure of the section 1031 exchange. Additionally, Ash claimed $166,000 in income from the property if the sale had been timely completed, payments to the lender of $42,000, $189,000 paid for a new loan above what he would have paid for the original loan that was terminated by the original lender, and $28,000 of interest on a loan to meet expenses. These direct damages totaled $1,033,000.[9] Ash also sought indirect damages of $1 million attributed to his loss of cash flow to retain and purchase properties.

Defendants' made motions for nonsuit based on a lack of causation and the defense of intervening and superseding cause. The trial court denied the motions and refused to give defendants' proposed instructions on causation and intervening/ superseding cause.

The jury returned its verdict finding that Lerner breached its contract by delaying the timely close of escrow, and was liable to Ash for $300,000, and that NAT breached its contract with Ash to provide proper and timely escrow and title services and was liable for $250,000 in contract damages. The jury also found that NAT was liable for negligence in the amount of $500,000 and for $250,000 for breach of fiduciary duty. The jury imposed punitive damages on NAT in the amount of $750,000. The trial court granted NAT's motion for judgment notwithstanding the verdict as to the punitive damage award, but otherwise denied the motions for new trial and judgment notwithstanding the verdict. Lerner and NAT timely appealed. Ash cross-appealed in connection with the punitive damages.

---

[9] The $3,000 discrepancy is due to rounding off some figures by the expert.

7

## DISCUSSION

### A.     Standard of Review

The determinations of whether there was a breach of contract and whether the contract damages are foreseeable are questions of fact (*Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 105-106; *Sun-Maid Raisin Growers v. Victor Packing Co.* (1983) 146 Cal.App.3d 787, 790; *Porter v. Arthur Murray, Inc.* (1967) 249 Cal.App.2d 410, 421;) and are governed by the substantial evidence test (*Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp.* (2007) 148 Cal.App.4th 937, 955-956; *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968)—i.e. whether there is substantial evidence to support the findings of the trier of fact.  "'Substantial evidence . . . is not synonymous with "any" evidence.  Instead, it is "'substantial proof of the essentials which the law requires.'"'  [Citation.]"  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  We view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences and resolve all conflicts in its favor.  (*Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1128-1129.)  Regarding whether the failure to give an instruction on intervening and superseding cause was error, we use the de novo standard of review.  (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1500.)

### B.     Damages Against Lerner and NAT for Breach of Contract—Forseeability

"Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable.  [¶]  In contrast, tort damages are awarded to compensate the victim for injury suffered.  [Citation.]  'For the breach of an obligation not arising from contract, the

8

measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.'  (Civ. Code, § 3333.)"  (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515-516.)

The court in *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 969 (*Lewis Jorge*) discussed this principle, pointing out that California follows the common law rule set forth by an English court in *Hadley v. Baxendale* (1854) 156 Eng.Rep. 145.  In that venerable English case, a shaft in Hadley's mill broke rendering the mill inoperable.  Hadley contracted with Baxendale to transport the shaft to an engineer to make a duplicate.  Hadley told Baxendale the shaft should be sent immediately, and Baxendale promised to have it delivered the next day.  Baxendale did not know the mill would be inoperable until the new shaft arrived.  Baxendale did not transport the shaft in the promised time, causing the mill to be shut down for an additional five days.  Hadley sued, inter alia, for lost profits resulting from the delay.  The court held that although a plaintiff is entitled to an amount that will place it in the same position it would have been had the breaching party performed, damages for special circumstances, such as in that case, can be assessed against the breaching party only when they were within the contemplation of both parties as a probable consequence of a breach.  Baxendale did not know that the mill would be shut down and would remain shut until the new shaft arrived.  Loss of profits could not fairly or reasonably have been contemplated by both parties without Hadley having communicated the special circumstances to Baxendale.  Thus, the court, in reversing the judgment, held that lost profits could not be awarded to Hadley.  (*Id.* at p. 152.)

The court in *Lewis Jorge*, *supra*, 34 Cal.4th at pages 969 through 970 added, "*Hadley* did not expressly distinguish between general and special damages.  But such a distinction flows naturally from that case; hence the rule that a party assumes the risk of special damages liability for unusual losses arising from special circumstances only if it was 'advised of the facts concerning special harm which might result' from breach—it is not deemed to have assumed such additional risk, however, simply by entering into the

contract.  [Citations.]  [¶]  The *Hadley* rule has long been applied by California courts, which view it as having been incorporated into California Civil Code section 3300's definition of the damages available for breach of a contract.  [Citations.]  Contract damages, unlike damages in tort (Civ. Code, § 3333), do not permit recovery for unanticipated injury.  [Citation.]  Parties may voluntarily assume the risk of liability for unusual losses, but to do so they must be told, at the time the contract is made, of any special harm likely to result from a breach [citations].  Alternatively, the nature of the contract or the circumstances in which it is made may compel the inference that the defendant should have contemplated the fact that such a loss would be 'the probable result' of the defendant's breach.  [Citation.]  Not recoverable as special damages are those 'beyond the expectations of the parties.'  [Citation.]  Special damages for breach of contract are limited to losses that were either actually foreseen [citation] or were 'reasonably foreseeable' when the contract was formed.  [Citation.]"  (See *Erlich v. Menezes* (1999) 21 Cal.4th 543, 550; *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 760 [special damages not foreseeable as a matter of law]; see also *California Press Mfg. Co. v. Stafford Packing Co.* (1923) 192 Cal. 479, 483.)  In III Farnsworth on Contracts (3d ed. 2004) section 12.14, pages 260 to 262 (Farnsworth), the author sets forth the criteria for foreseeability in part as follows:  "foreseeability is to be determined as of the time of the making of the contract"; "what must be foreseeable is only that the loss would result if the breach occurred"; "it is foreseeability only by the party in breach that is determinative"; "foreseeability has an objective character"; and "the loss need only have been foreseeable as a probable, as opposed to a necessary or certain, result of the breach."

The instant case is governed by the *Hadley v. Baxendale, supra,* 156 Eng.Rep. 145 principle adopted by our Supreme Court.  To the extent any part of the $250,000 of damages for the breaches of contract by Lerner and NAT is attributable to expenses incurred in connection with the bankruptcy and the loss of the deferral of the capital gains tax, such damages are not general damages, i.e., those "'which, in the ordinary course of things, would be likely to result'" from the breach (Civ. Code, § 3300) and which "flow

10

directly and necessarily from a breach of contract, or that are a natural result of a breach" and are within the contemplation of the parties. (*Lewis Jorge, supra,* 34 Cal.4th at p. 968.) Rather, they "are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." (*Ibid.*) These "[s]pecial damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)." (*Id.* at pp. 968-969.) Moreover, "[s]pecial damages 'will not be presumed from the mere breach' but represent loss that 'occurred by reason of injuries following from' the breach. [Citation.]" (*Id.* at p. 969.)

Because counsels' arguments to the jury are not evidence, we look to the testimony of the witnesses and the documents introduced as exhibits to assess the foreseeability of the bankruptcy. There is no evidence in the record that Ash communicated to Lerner or NAT at the time of contracting—the relevant time—or at anytime, that the bankruptcy of LandAmerica and indefinite freezing of segregated accounts could result from a short but untimely delay in the escrow closing. There is no evidence in the record, expert or otherwise, that Lerner or NAT knew or should have known of this risk at the time of contracting or anytime. The transaction in issue took place in the fall of 2008, during an economic recession. Evidence of the various events that allegedly took place during 2008 and their timing is not in the record. There is no evidence as to what facts Lerner or NAT knew concerning those events. Whatever Ash's apprehensions were are irrelevant. Only the communications to or knowledge of Lerner and NAT are relevant to foreseeability.

Ash, even though ostensibly risk averse, having been in the real estate business and having consulted others in the business, chose the 1031 exchange intermediary and purportedly protected himself by having the proceeds of his sale deposited in a segregated account. There is not substantial, if any, evidence that under these circumstances, Ash was aware of any risk to the funds he placed in a segregated account, much less that he communicated any such risk to Lerner or NAT or that Lerner or NAT

11

should have known of any such risk. That Ash was not aware of any risk supports the position that neither Lerner nor NAT was aware or should have been aware of any such risk at the time of the contract.

The real estate brokers and agents involved, an escrow expert, and a LandAmerica employee, all testified that they did not foresee any risk to the funds deposited with LandAmerica. Ash's damages expert stated that what occurred is "a fairly rare occurrence" and is "fairly unusual." Again, this evidence dispels any notion that Lerner or NAT were or should have foreseen the risk of bankruptcy. Lerner just wanted to sell his property, and NAT was just the escrow company. Presumably, it did not matter to Lerner or NAT whether the sale was part of a section 1031 exchange, other than the exchange was what motivated the buyer, Ash.

To suggest that Lerner and NAT should have known of the risk is speculation and not based on any evidence. There is no evidence that the parties to the transaction were concerned that the economy or other institutional failures created a risk to the funds placed in a segregated account with LandAmerica. The evidence does not show that LandAmerica was part of purported banking system problems of which Ash was aware. He had used LandAmerica for escrow and other services before. There is nothing in the record or even argued by Ash concerning the precise nature of economic conditions at the time of the contract and how they might have impacted a section 1031 qualified intermediary such as LandAmerica, which is not a bank. There was no evidence that Lerner and NAT knew or should have known at the time of contracting that if the escrow did not close in time, the section 1031 qualified intermediary selected by Ash would or could go bankrupt or that Ash would or might not be able to recover his funds in time to qualify for a tax deferral. The papers appointing LandAmerica to serve as a section 1031 intermediary were signed over a month after the escrow opened. Thus, defendants did not contemplate the LandAmerica bankruptcy or the consequences thereof.

That there is no evidence in the record that at the time of the contracts the bankruptcy of LandAmerica was reasonably foreseeable by any of the participants—most importantly, Lerner and NAT—is consistent with the general view that bankruptcies

normally are not within the contemplation of the parties at the time of a contract. (See *Fiduciary Trust Co. v. Bingham Dana & Gould & Others* (2003) 789 N.E.2d 171, 178 ["plaintiffs offered nothing to refute or even to suggest Gaston's bankruptcy was reasonably foreseeable . . . at the time" of defendant's alleged malpractice]; *Martin Marietta Corp. v. Fireman's Fund Ins. Co.* (4th Cir. 1988) 852 F.2d 566, 570 ["financial ruin of an apparently sound company is not normally a foreseeable consequence of those acts"]; *Held Construction Co. v. Michigan National Bank of Detroit* (Mich.App. 1983) 335 N.W.2d 8, 10; *In re Construction Diversification, Inc.* (D.C. Mich. 1983) 36 B.R. 434, 439 [bankruptcy damages not recoverable in breach of contract action absent bad faith]; *Howard v. Nicholson* (Mo.App. 1977) 556 S.W.2d 477, 483 ["While the possibility of bankruptcy of businesses in general is a foreseeable and all-too-frequent occurrence, the future bankruptcy of a particular company, the continuing existence of which was essential to complete the entire transaction, was not reasonably within the contemplation of the parties at the time of contracting such that the parties would have made provision for such an event"].)[10]  As stated in one authoritative work, "[u]nless financial ruin is a consequence arising naturally from a breach of contract, damages sought by the nonbreaching party for financial ruin are not recoverable unless a risk of insolvency was within the actual contemplation of the parties at the time the contract was made."  (Henshaw and Kempflen, 7 Mich. Civ. Jur. Damages (2013) § 77.)

There are certain situations, unlike the one here, in which a bankruptcy is foreseeable if there is a breach of contract.  For example, when a health maintenance organization improperly terminates a contract with a healthcare provider, it can expect dire financial consequences will arise for the latter.  (See *In re Doctors Health, Inc. v. Nylcare Health Plans of the Mid-Atlantic, Inc.* (D.Md. 2005) 335 B.R. 95, 121.)  If the breaching party breaches a contract to purchase stock when he knows of the other party's desperate financial need to sell the stock, a bankruptcy might be considered foreseeable.  (See *Hallmark v. Hand* (Tex.App. 1992) 833 S.W.2d 603, 612.)  When an insurer

---

**10**     These cases appear to have decided the issue of foreseeability as a matter of law.

13

wrongfully refuses to pay a claim, the adverse financial consequences can be foreseeable. (Cf. *Reichert v. General Ins. Co. of America* (1968) 68 Cal.2d 822 [issue not reached].) Here, there was no evidence the parties considered the bankruptcy of LandAmerica to be a foreseeable consequence of any delay. As noted, Ash deposited the sums in a segregated account with the understanding they would be safe. If he thought they were safe, there was no reason to conclude that defendants nevertheless should have contemplated that the deposit was unsafe.

Also, there was no evidence that Lerner or NAT had any knowledge at the time of contracting of the possibility that a bankruptcy judge for such a lengthy period of time would not release the money in a segregated account. Indeed, under the circumstances, it was unforeseeable that a bankruptcy court would not release the funds in an account, especially in a segregated account, in time to meet the requirements for a tax free exchange. (See Funk, *supra,* 25 No. 2 Prac. Tax Law 43; Roth et al., *Committee Educational Session: Bankruptcy Taxation/Real Estate Lessons from LandAmerica: Who Has My Money? The Unexpected Perils* of § 541, Dec. 1, 2011 American Bankruptcy Institute 449 ["Outrage and Acrimony over the Court's decision [in the LandAmerica case]"]; *Siegel v. Boston* (*In re Sale Guar. Corp.*) (9th Cir. 1998) 220 B.R. 660, aff'd (9th Cir. 2000) 199 F.3d 1375 [funds deposited in a separate trust account of qualified intermediary are not property of the bankruptcy estate].) Moreover, there was no evidence that defendants at the time of the contracts had knowledge that Ash would incur expenses related to the bankruptcy.

As stated in Williston on Contracts, "If the contract is silent with respect to the risks the defendant has assumed, the court will determine what risks were foreseen or foreseeable when the contract was made by viewing the matter in the light of common sense; and the courts will consider the nature and purpose of the contract, and the surrounding circumstances known by the parties to exist at that time, as well as what the breaching party may reasonably be supposed to have assumed consciously." (24 Williston on Contracts (4th ed. 2013) § 64.13.) Because there was no evidence that the bankruptcy and bankruptcy judges's refusal to release funds in a segregated account

14

were, at the time of the contracts, within the contemplation of the Lerner and NAT or that at those times they should have contemplated the probability of the result, the damages arising from those events were not foreseeable for purposes of awarding contract damages.

Accordingly, the trial court should reduce the contract damages judgment against Lerner and NAT by amounts attributable to the bankruptcy and bankruptcy court's delay in releasing the deposited funds. The matter is remanded for determination of damages not attributable to the bankruptcy, including the legal fees in that proceeding and the bankruptcy court's delay in releasing the funds.

### C.     Intervening and Superseding Cause

The defendants invoked the tort defense of intervening and superseding cause, but the trial court refused to instruct the jury on those defenses. A principle in tort law is that when "subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a *superseding cause*, and the defendant is not liable." (6 Witkin, *Summary of Cal. Law* (10th ed 2005) Torts § 1197, p. 574 and case cited therein.)

The Restatement Second of Torts distinguishes between "superseding cause" and "intervening force." The Restatement Second of Torts, section 440, provides that "a superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." The Restatement Second of Torts, section 441, subdivision (1) states, "An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." Another authority states, "An intervening act is regarded as a superseding cause when it is outside the scope of the risk the defendant negligently created. This idea is usually expressed in

15

shorthand by saying that if the intervening act is itself unforeseeable then it may become a superseding cause." (1 Dobbs et al., The Law of Torts (2d ed. 2013) § 212, p. 741 (Dobbs).)

A superseding cause relieves a defendant from tort liability for a plaintiff's injuries, if both the intervening act and the results of the act are not foreseeable. "[W]hat is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence." (*Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57-58.) "Whether an intervening force is superseding or not generally presents a question of fact, but becomes a matter of law where only one reasonable conclusion may be reached. [Citation.]" (*Chanda v. Federal Home Loans Corp.* (2013) 215 Cal.App.4th 746, 756; see also *Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 680-681.)

The defense of intervening and superseding cause applies in tort cases. In contract cases, the defense does not absolve the defendant of liability, although closely related is the principle that if the special damages are not foreseeable and proximately caused by the breach of contract they are not recoverable.[11] As one authority has noted, "Breach may not be precluded, however, by the presence of other contributing causes—multiple or intervening. Although the injured party's own failure to avoid loss may bar recovery for that loss, this is not thought of as a consequence of a requirement of causation but of a limitation under a 'mitigation' rule." (III Farnsworth, *supra,* at § 12.1, p. 151, fns. omitted.) Thus, the Lerners cannot invoke the defense of intervening and superseding cause applicable to torts because no tort claims were asserted against them.[12]

---

[11]     See VerSteeg, *Perspectives on Foreseeability in the Law of Contracts and Torts: The Relationship Between "Intervening Causes" and "Impossibility"* (2011) 2011 Mich. St. L.Rev. 1497, 1510 ("The Contract doctrine that we typically label as 'impossibility, impracticability, frustration of purpose,' or, as the Uniform Commercial Code refers to it, 'failure of presupposed conditions,' and the Tort doctrine of 'intervening and superseding causes' are actually one and the same").

[12]     See Schneider, *Consequential Damages in the International Sale of Goods: Analysis of Two Decisions* (1995) 16 U. Pa. J. Int'l Bus. L. 615, § 2.2.4.1, fn. 74 ("When

Ash contends that the claims against NAT include an intentional tort, and therefore the intervening and superseding act doctrine does not apply, as it applies only to NAT's negligence. Ash asserts that so long as the intentional tort of breach of fiduciary duty was a substantial factor in causing the harm, NAT cannot escape liability even if there were an intervening and superseding cause. (*United States Fid. & Guar. Co. v. American Employer's Ins. Co.* (1984) 159 Cal.App.3d 277, 285 ["'[T]he notion of independent intervening cause has no place in the law of intentional torts, so long as there is a *factual* chain of causation,'" quoting *Tate v. Canonica* (1960) 180 Cal.App.2d 898, 907]; disapproved in other grounds in *J.C. Penney Casualty Ins. Co. v. M.K.* (1991) 52 Cal.3d 1009, 1019, fn. 8; *Bank of New York v. Fremont General Corporation* (9th Cir. 2008) 523 F.3d 902, 910; *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535, fn. 6; Rest.2d Torts, §§ 435A, 435B; but see *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1036 ["This comes close to pleading an intentional tort. From that prospect, the doctrine of superseding cause is less likely to cut off the chain of events put in motion by the original conduct of the tortfeasor . . . even the 'but for' consequences of an intentional tort are not without limitation"]; Wright, Symposium, *Baseline and Counterfactuals in the Theory of Compensatory Damages: What Do Compensatory Damages Compensate?* (2003) 40 San Diego L.Rev. 1425, 1478 ["The superseding cause limitation applies to all tort actions, including the intentional torts"].) Assuming, without deciding, that the defense of intervening and superseding cause does not apply to any intentional tort, we must examine the claim against NAT, which claim was breach of fiduciary duty.

"'The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused

a contract is breached or a tort committed, resulting losses or damages may not be caused by the actual breach or the tort itself, but rather by multiple or intervening causes . . . . Such multiple or intervening causes are less likely to relieve a defendant from contractual liability than from tort liability"); III Farnsworth, *supra,* at section 12.1, page 151, footnote 9 ("Although the same problems of multiple causes and of intervening causes that enliven the law of torts also arise in connection with contract damages, they are relatively less important than in the law of torts").

by the breach.'" (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 932.) The breach of fiduciary duty can be based upon either negligence or fraud depending on the circumstances. (See *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 563; see also *Federal Deposit Ins. Corp. v. McSweeney* (S.D. Cal. 1991) 772 F.Supp. 1154, 1157.) It has been referred to as a species of tort distinct from causes of action for professional negligence (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1534) and from fraud (*Salahutdin v. Valley of California, Inc., supra,* 24 Cal.App.4th at p. 562).

The trial court instructed the jury as follows: "The Ash Trust claims that it was harmed by NATCO'S breach of the fiduciary duty to use reasonable care. To establish this claim, the Ash Trust must prove all of the following: 1. That NATCO was the Ash Trust escrow holder; 2. That NATCO acted on the Ash Trust's behalf for purposes of purchasing a commercial property; 3. That NATCO failed to act as a reasonably careful escrow holder would have acted under the same or similar circumstances; 4. That the Ash Trust was harmed; and 5. That NATCO's conduct was a substantial factor in causing the Ash Trust's harm." The trial court did not instruct the jury that it was required to find the breach of fiduciary duty to be intentional. And the trial court refused to instruct the jury on constructive fraud.

As it appears that the breach of fiduciary duty might have arisen from negligence, the intervening and superseding act doctrine could have been applicable. As suggested above, there is a question as to whether the intervening and superseding act doctrine is applicable to intentional torts. And, as noted above, in *Brewer v. Teano*, *supra*, 40 Cal.App.4th at page 1036, the court said that the doctrine "is less likely to cut off the chain of events put in motion by the original conduct of the tortfeasor."[13] In *Tate v.*

---

[13]    In *Ventas, Inc. v. Health Care Prop. Investors, Inc.* (W.D. Ky. 2009) 635 F.Supp.2d 612, 624, the court predicted Kentucky law would apply the intervening and superseding cause doctrine to intentional torts, relying on a Kentucky comparative fault statute that applied to both negligent and intentional torts. In California, comparative fault only applies to negligence causes of action. (*People v. Brunette* (2011) 194 Cal.App.4th 268, 282.) In *Hibma v. Odegaard* (7th Cir. 1985) 769 F.2d 1147, the court

18

*Canonica, supra,* 180 Cal.App.2d at page 909, the court noted that the rule on an intervening and superseding act would apply "where the act of the defendant was intentionally done, but there was no intent to cause injury." We do not have to decide whether an intervening or superseding act can be a defense to an intentional tort because here the trial court did not instruct the jury that in order to find a breach of fiduciary duty, it had to find that NAT intentionally breached its fiduciary duty.

Also, the intervening and superseding act itself need not necessarily be a negligent or intentional tort. For example, the culpability of the third person committing the intervening or superseding act is just one factor in determining if an intervening force is a new and independent superseding cause. (Rest.2d Torts, § 442, subds. (e) and (f); see also 1 Dobbs, *supra*, § 210, pp. 729-732 [acts of nature]; 4 Harper et al. on Torts (3d ed. 2007) § 20.5, p. 179 ["extreme force"].)

Our Supreme Court has pointed out that "[a] tort is a legal cause of injury only when it is a substantial factor in producing the injury." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) As relevant here, the court added, "This principle is distinct from the defense of 'superseding cause,' which absolves a tortfeasor, even though his conduct *was* a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible. [Citations.] It is also distinct from the doctrine of 'concurrent causes,' which holds that when two or more tortious acts combine, each contributing significantly to a single ultimate harm, *each* act is deemed a substantial and legal cause of injury, making each concurrent tortfeasor fully liable. [Citations.]" (*Id.* at p. 573, fn. 9.)

The trial court refused a proposed jury instruction on intervening and superseding cause (CACI No. 432), which instruction was based on NAT's defense theory. A party is entitled to nonargumentative and correct instructions it requests on every theory advanced by that party if the theory is supported by substantial evidence. (*Soule*, *supra*, 8

held that the deputy sheriffs who framed the plaintiff were not liable to the plaintiff for a sexual assault on the plaintiff by other prisoners.

19

Cal.4th at p. 572.)  We review the evidence most favorable to the applicability of the requested instruction, as a party is entitled to that instruction if that evidence could establish the elements of the theory presented.  (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1540.)  But "'[a] judgment will not be reversed for error[] in jury instructions unless it appears reasonably probable that, absent the error, the jury would have rendered a verdict more favorable to the appellant.  [Citation.]'  [Citation.]"  (*Ibid.*)

NAT contended at trial that LandAmerica's bankruptcy, the ensuing freezing of the segregated account, and the bankruptcy court's refusal to release the funds occurred after NAT's conduct caused Ash his damage and was highly unusual.  NAT claimed it had no reason to expect such occurrences, and the resulting harm was different than that which could be expected from NAT's conduct.  There was sufficient evidence that the bankruptcy constituted "an independent event [intervening] in the chain of causation, producing harm of a kind and degree so far beyond the risk" (*Soule, supra,* 8 Cal.4th at p. 573, fn. 9) that NAT should have foreseen, that the jury should have been given the intervening and superseding cause instruction.  The failure to give that instruction constituted error.  (See *id.* at p. 573 and at fn. 10.)

Moreover, the error was prejudicial.  The general instructions on causation do not render the error harmless because the doctrine of intervening and superseding cause assumes that a defendant's conduct was a substantial contributory factor—i.e. that there was causation.  (*Soule*, *supra*, 8 Cal.4th at p. 573, fn. 9.)  The jury finding that NAT was responsible for $250,000 as foreseeable contract damages suggests that the remaining $750,000 of Ash's tort damages against NAT for negligence and breach of fiduciary duty were not based on the contract standard of damages but on tort principles.  As the jury was not given an instruction on the defenses of intervening and superseding cause, it could not properly consider whether NAT should be responsible for a tort or tort damages.  That NAT's conduct was found to be wrongful does not determine whether an intervening and superseding event relieves NAT of liability.  Had the jury been instructed on intervening and superseding cause, it is reasonably probable that it would have come to a different result, for damages were caused by the bankruptcy proceedings—an

independent event that caused a harm that could not be foreseen by NAT.  (*Soule, supra,* 8 Cal.4th at p. 573, fn. 9.)

This conclusion is evident from our determination that, in view of the evidentiary presentations in this case, the bankruptcy events were unusual and not reasonably foreseeable.  "Since the court's general instruction on causation did not go into the circumstances of this particular case but dealt with the defense of superseding cause by negative implication only, the jury may well have overlooked that defense in untangling the issues and arriving at its verdict."  (*Self v. General Motors Corp.* (1974) 42 Cal.App.3d 1, 10 (overruled on other grounds in *Soule*, *supra*, 8 Cal.4th at p. 580).)  Moreover, as the contract damages for the bankruptcy were not foreseeable, those damages should not be invoked to render the instructional error harmless.

### D.     Other Contentions

In view of our conclusions, we do not have to address many of the other contentions by the parties.

#### 1.     *Accountant's Testimony*

Because of the decisions on foreseeability and intervening and superseding cause, whether the accountant's testimony on the transaction and damages was appropriate need not be addressed.

## 2. *Special Instruction on Estoppel*

NAT and Lerner contend that the trial court erred by refusing to give a special instruction on estoppel based on Ash's alleged acquiescence in the escrow delay. The elements of estoppel are that the party to be estopped must be aware of the facts, he must intend that his conduct be relied upon or acted on so that the other party should reasonably believe it was so intended, the other party must not know the true facts, and the other party must rely on the conduct. (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 28.) Estoppel may not be applied if any of these elements is missing. (*Hair v. State of California* (1991) 2 Cal.App.4th 321, 328.) There was no evidence Lerner relied on anything Ash said in this regard. Moreover, Ash did not know that NAT did not intend to follow his directions. Thus, there was no error in not giving an estoppel instruction.

## 3. *Special Instruction on Causation*

NAT and Lerner contend that the trial court erred by refusing to give their proposed instruction on speculative causation. The trial court correctly instructed the jury that the breach must be a substantial factor in causing the damages and that the causal occurrence be reasonably certain. (See *US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909.) The intervening and superseding cause instruction that should have been given as to NAT and the elimination of damages that are not foreseeable should cover Lerner's and NAT's contentions on this instruction.

## 4. *CACI No. 361 and Special Verdict*

CACI No. 361 provides, "The Ash Trust has made claims against NATCO for breach of contract; breach of fidiciary duty; and negligence. If you decide that the Ash Trust has proved all of . . . those claims, then the same damages that resulted from those claims can be awarded only once." Defendants claim this instruction along with the use of a special verdict form was error, citing *Singh v. Southland Stone, U.S.A. Inc.* (2010) 186 Cal.App.4th 338, as well as the instruction to the jury not to total the damage award.

22

But defendants requested CACI No. 361 and did not object to the special verdict form. Any error in giving the instruction in the language of CACI No. 361 was invited (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000), and the failure to object to the special verdict form was forfeited. Moreover, the damages awarded did not exceed the amount requested. The jury awarded different sums for each cause of action and did not write the total amount of the damages on the verdict form. On remand, the trial court may take further steps to avoid any duplicate damages awards.

### 5. *Instruction Not to Total Damages*

Any contention that the trial court erroneously instructed the jury not to total the damages award was forfeited because NAT and Lerner requested the instruction based on CACI No. 361, did not object to the jury form on the ground that it allowed damages to improperly be calculated, and stipulated to the responses that the trial court provided to the jury questions during deliberations.

### 6. *Interpretation of Jury's Verdict*

NAT contends the trial court incorrectly added together the jury's findings on damages for contract and tort causes of action. It contends that Ash cannot obtain tort damages for a breach of the escrow instructions (see *Money Store Investment Corp. v. Southern Cal. Bank* (2002) 98 Cal.App.4th 722, 732) or at least must elect between causes of action. It appears that Ash introduced evidence that NAT's conduct went beyond a breach of contract. But, in view of our reversal, we need not reach this issue.

### 7. *Sufficiency of the Evidence*

Because of our reversals on both the contract and tort causes of action, we need not reach the issue of damages as to Lerner or liability as to NAT. There was substantial evidence to support the findings that Lerner and NAT breached their contracts with Ash. The expected closing date as set forth in the parties' agreement was November 21, 2008. The purchase agreement and escrow instructions stated that time was of the essence.

23

There was testimony that the closing date was mandatory. With the acquiescence of NAT, Lerner did not submit his deeds of trust or vesting information into escrow in time to close. There was evidence that Ash had done everything required of him to close escrow on November 21, 2008. There was evidence that the funds could have been wired on November 21, 2008. As noted above there was substantial evidence that Ash did not know what prevented Lerner from providing the necessary material to close, and there was substantial evidence that Lerner and NAT did not rely on anything Ash said or did to cause the escrow not to close on time.

### 8.     *Attorney Fees*

In view of our decision, the issues regarding attorney fees will have to be resolved upon remand.

### 9.     *Rulings on Motions*

Defendants contend their motions for nonsuit, judgment withstanding the verdict, and new trial should have been granted. In view of our decision, we need not deal with these issues except that we remand for a new trial on whether NAT is liable on the damages issue.

### 10.     *Punitive Damages*

Ash contends the trial court erred in granting NAT's motion for judgment notwithstanding the verdict on the issue of punitive damages. In view of our decision, we do not have to resolve this issue.

### 11.     *Amendment of Complaint*

Ash contends he should have been granted leave to file a second amended complaint adding a cause of action that Lerner aided and abetted NAT's breach of fiduciary duty, even though Ash waited more than two years from the filing of the complaint and more than one year after filing the operative amended complaint before

24

seeking leave to file another amended complaint.  This issue may be considered by the trial court upon remand.

### E.    Conclusion

We reverse and remand the matter for retrial on the issue of damages for breach of contract and as to tort liability of NAT consistent with this opinion.  (See *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 782; *Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 332; *Bliss v. Cal. Cooperative Producers* (1952) 112 Cal.App.2d 507.)  The issues to be retried are not so inextricably intertwined that a complete new trial as to the breach of contract claims is required.  (See *Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284-285.)

## DISPOSITION

We affirm as to the liability of Lerner and NAT for breach of contact.  We reverse and remand the matter as to contract damages as to Lerner and NAT and tort liability of NAT.  Each party shall bear his or its own costs of appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**

MOSK, Acting P. J.

I concur:

KUMAR, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

KRIEGLER, J., Dissenting.

I respectfully dissent.

My colleagues reverse the judgment on the theory the evidence is insufficient as a matter of law to establish that the damages suffered by the buyer were foreseeable. I disagree and would hold, after viewing the evidence in the light most favorable to the judgment, that the issue of foreseeability was properly left to the jury's determination.

The escrow company breached an agreement with the buyer to secure his funds by a specified date, leaving the funds with an intermediary. Whether the intermediary's bankruptcy was foreseeable to the escrow company based on the facts and circumstances of this case is a question on which reasonable minds can differ, making it an appropriate issue for the jury to decide. There is sufficient evidence to support the jury's determination that the bankruptcy and the buyer's damages were foreseeable to the escrow company. The seller breached the agreement as well, by failing to meet the escrow deadline, although the jury found the majority of the buyer's damages (including the tax consequences) were not foreseeable to the seller. However, the jury's finding that some of the damages were foreseeable to the seller as a result of missing the escrow deadline is supported by substantial evidence.

I agree with the majority opinion that a superseding cause instruction was warranted with respect to the tort actions against the escrow company. However, in light of the arguments at trial and the jury's findings, I do not believe it is reasonably probable that the jury would have come to a different result if the instruction had been given.

## FACTS AND PROCEDURAL BACKGROUND

Our duty on appeal is to view the facts in the light most favorable to the judgment. (*Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1128-1129.) Because my view of the facts supporting the judgment differs significantly from the majority, I set forth the facts in accordance with the standard of review.

## I. Property Purchase Agreement

Plaintiff and appellant David Ash, as trustee of the David Ash Trust dated January 10, 2008, owned commercial property on Wilshire Boulevard. He entered into an agreement to sell the Wilshire property on September 8, 2008. His brokers and accountant said he could defer capital gains tax under Internal Revenue Code section 1031 (section 1031) by using the proceeds to purchase a replacement property. Ash researched tax deferred exchanges. Under section 1031, he was required to place the sale proceeds with a qualified intermediary, identify a replacement property within 45 days, and complete the purchase within 180 days. Ash intended to use TIMCOR Exchange Corporation 1031, a subsidiary of Washington Mutual, as the intermediary, because it was the most familiar company.

Ash found a commercial property for sale on Venice Boulevard that fit his needs. The property was owned by defendants and appellants Richard Lerner, as trustee of the Lerner Family Trust, and Richard and Gloria Lerner, as trustees of the Exemption Trust of the Lerner Family Trust (collectively Lerner).[1]

Ash submitted a purchase offer for the Venice property on September 29, 2008. Lerner's counteroffer on October 6, 2008, signed by Richard, stated that the seller was "Lerner Family Trust" and provided Lerner the right to select the escrow holder. Ash accepted the counteroffer on October 8, 2008, and delivered a deposit of $50,000.

Ash could not use TIMCOR as an intermediary, however, because Washington Mutual had declared bankruptcy in the interim and closed operations. Ash spoke with brokers and selected qualified intermediary LandAmerica Exchange Services, Inc. He arranged for LandAmerica to receive the sale proceeds from the escrow on the Wilshire property and place them in a segregated account held by LandAmerica for Ash's benefit. LandAmerica prepared an agreement for the transaction dated October 8, 2008.

---

[1]  Because more than one party or participant shares the last name Lerner, they are referred to individually by their first names.

2

Lerner's real estate agent was Rick Rivera at Centers Business Management (CBM). Rivera selected defendant and appellant North American Title Company (NAT) to provide escrow services and title insurance. NAT title officer Victor Greene prepared a preliminary title report for the Venice property dated October 10, 2008, which he sent to CBM. The report stated that title to the property was held as follows: a 50 percent interest held by Barbara Simkin, Bernard David Lerner, Richard Scott Lerner, Gloria Lee Lerner, and Irving Reifman as trustees of the Ray Lerner Irrevocable Trust; and a 50 percent interest held by Barbara Simkin, Bernard David Lerner, Richard Scott Lerner, and Gloria Lee Lerner as trustees of the Exemption Trust of the Lerner Family Trust dated November 17, 1986. The report included a form that Lerner needed to complete to certify that the signatories had authority to act for the trust.

Rivera contacted NAT escrow officer Maria Jennings on October 13, 2008, to act as the escrow officer. Jennings prepared escrow instructions on October 17, 2008, which identified the seller as "The Lerner Family Trust" and stated the expected closing date for escrow was November 21, 2008.

Richard decided to record a note and deed of trust on the Venice property to secure a debt that Lerner owed to a third party. He would use the sale proceeds to pay off the note. Paying the debt through escrow would provide tax benefits to Lerner. Richard arranged for his attorney, James Fisher, to manage the transaction. Attorney Fisher did not know the escrow deadline.

Richard also planned to defer Lerner's capital gains tax on the sale through a section 1031 exchange. On November 4, 2008, CBM's in-house attorney, Jeffrey Adelman, wrote an e-mail to Richard stating, "So that we avoid the vesting issues we had to clean up at [two other properties], please confirm EXACTLY how title is held for [the Venice property] and EXACTLY who will be doing a [section] 1031 exchange." Richard asked him to send information showing the recorded title for the Venice property.

On November 5, 2008, Ash removed all of the buyer contingencies and instructed NAT to meet the escrow deadline. Lerner learned that Ash planned to get a loan from US Bank for part of the purchase price.

3

On November 6, 2008, Jennings alerted Rivera that vesting information was required for the property. Rivera asked her to identify the necessary information. Jennings replied that the title to the property reflected two trusts, so NAT needed copies of the trust agreements and all amendments, a confirmation that Richard had authority to sign on behalf of both trusts, and death certificates for previous trustees. Rivera e-mailed NAT's request to Richard.

Richard responded that his mortgage broker Barry Weinstock had handled vesting information five times previously, and Attorney Fisher had replaced one of the former trustees. Richard requested Attorney Fisher send certain documents to Rivera, and that Rivera obtain the rest of the information from Weinstock.

Escrow closed on Ash's Wilshire property and the sale proceeds were deposited with LandAmerica in the segregated account for Ash's benefit. After Ash had entered into the agreement with LandAmerica, he developed concerns about LandAmerica's financial viability. The banking system was collapsing and Ash was afraid of the state of the entire industry. He needed the income from the Venice property. He wanted to move forward as quickly as possible to get the income and be protected.

Ash could not direct LandAmerica to transfer his funds to the Venice property escrow without violating the section 1031 exchange requirements. On November 12, 2008, Ash asked LandAmerica employee Sarah Blankenship to communicate with Jennings to transfer $120,000 to escrow. Ash also instructed Jennings to demand the wire transfer from LandAmerica. On November 13, 2008, Blankenship and Jennings exchanged documents by e-mail, including wiring instructions. Blankenship transferred $120,000 into escrow that day. LandAmerica was already holding the sale proceeds in accordance with the intermediary agreement dated October 8, 2008, when Ash finally signed the agreement on November 13, 2008.

Weinstock provided some of Lerner's vesting information on November 14, 2008, which Jennings forwarded to Greene on November 17, 2008.

On November 19, 2008, two days before escrow was scheduled to close, US Bank employee Robert Kaempen delivered the following to NAT on Ash's behalf: cashier's

checks totaling $842,000, a deed of trust, a document verifying that Ash was the sole authorized trustee of the Ash Trust, and amended escrow instructions directing NAT to record the deed of trust before the close of escrow. Ash began accruing interest on the loan at the rate of $500 per day.

That same day, Ash repeatedly asked Jennings to request the rest of the purchase funds from LandAmerica, which she confirmed that she would do. Ash told Jennings several times that he needed the income from the Venice property, wanted to get the escrow completed, and wanted to have his funds safely reinvested.

Ash's real estate broker Robert Laswell spoke with Jennings in the late afternoon. She told him that all the funds were in. He believed NAT had received Ash's funds from LandAmerica and escrow would close a day early.

On the afternoon of November 19, 2008, Attorney Fisher spoke to Jennings for the first time. He said he would be giving her two deeds of trust securing notes payable to third parties which he wanted recorded prior to the close of escrow. Jennings told him to get the deeds of trust to her by 3:30 p.m. the next day, if he wanted them recorded by Friday. Jennings agreed to prepare payoff demands, escrow instructions, and an acknowledgement. In an e-mail confirming their responsibilities, Attorney Fisher referred to "the escrow tentatively scheduled to close the following week." Jennings opened a separate escrow for Lerner's transaction with the third party.

On the morning of November 20, 2008, Jennings gave Attorney Fisher's contact information to Greene. Greene said he was reviewing Lerner's trust documents and they probably would need additional information.

Before noon on November 20, 2008, Richard sent an e-mail to Rivera in which he expressed regret if the third party transaction delayed the escrow closing. He added, "It is my fault because I thought the escrow was not closing until the end of the month. I will do my best to urge [Attorney Fisher] to expedite his matters."

LandAmerica needed an estimated closing statement from Jennings stating the amount to transfer. Shortly after noon, Ash sent an e-mail to Jennings asking if she had

5

received his funds from US Bank. "If so, is it possible to get me something so I can ask LandAmerica to wire you the remaining balance?"

Attorney Fisher, Jennings, and Greene continued to exchange documents and instructions about Lerner's transaction with the third party. Jennings wrote an e-mail to Ash, "I got the funds today, I am working on your file exclusively today. I will have an estimate for you shortly. I am working on some last minute things for the Seller that is going to delay us a bit. I will keep you posted on how that is all progressing. I am thinking that we are going to be pushed to Monday or Tuesday of next week." Ash responded, "No Problem. Do I get a discount;) (jk)." However, in a later telephone conversation, Jennings said escrow would not close on time and Ash said he was not approving a delay. Jennings said she would see what she could do to get it done.

Jennings prepared and e-mailed documents for the third party to sign. At 4:15 p.m., Jennings sent an e-mail to Rivera explaining that attorneys in the third party transaction were reviewing documents. She said she had told Richard that every day the deeds of trust were not recorded pushed the escrow closing one day later. She told Richard and Attorney Fisher that if they wanted the deeds of trust recorded the next day, she needed them by 3:30 p.m., but they had not been delivered. She added, "Richard asked me if all these last minute issues were preventing this escrow from closing tomorrow and I respectfully told him 'Yes.'" She noted Greene had contacted Attorney Fisher for trust certifications, so he could finalize the seller vesting issues.

At 4:34 p.m., Jennings e-mailed a revised closing estimate to Ash. She sent a trust certification for him to complete, but acknowledged later that she already had the trust certification he signed for US Bank.

Ash forwarded the closing estimate to Blankenship. At 4:48 p.m., Blankenship requested that Ash send a signed copy of the closing estimate and asked Jennings for wiring instructions. Ash faxed Blankenship a signed copy of the closing estimate. Jennings did not reply.

On Friday, November 21, 2008, the day escrow was scheduled to close, Jennings had all the funds necessary from Ash to close the transaction except the wire transfer

from LandAmerica. Blankenship sent another e-mail to Jennings asking, "When do you need the funds wired?" Jennings did not respond. Ash tried to call Jennings several times but was not able to reach her. He believed the wire transfer from LandAmerica had been completed.

At 1:16 p.m. on November 21, 2008, Jennings sent documents for the third party to sign. She notified Lerner that escrow could close if they got copies of the documents back by e-mail or fax. Lerner asked NAT to record the third party deeds of trust as an accommodation, releasing NAT from claims arising from the recording.

At 4:24 p.m. on November 21, 2008, Richard e-mailed some of the remaining vesting documents to Jennings. He could not find a copy of the exemption trust. He wrote, "I will look over the weekend at my home storage unit for a copy. Please [ask] your title person if the waiver is sufficient especially in light of the recorded deeds." The third party e-mailed executed documents to Jennings at 4:55 p.m., but without the complete vesting documents, escrow could not close.

On Monday, November 24, 2008, LandAmerica notified its clients that it was filing for bankruptcy. The bankruptcy court froze all of the assets that LandAmerica controlled. Jennings wrote an e-mail to Blankenship and Ash asking, "Sarah or David, can you confirm how much you will be wiring and when you will wire?" NAT recorded the third party deeds of trust that day.

Lerner's vesting issues were later resolved, and the parties eventually executed agreements to extend escrow. Ash would not have signed the extension agreements, however, if he had known of Lerner and NAT's actions that prevented escrow from closing. Ash did not cancel the transaction, because he would have lost his deposits and been unable to complete the tax-deferred exchange. He paid interest on the US Bank loan. After five months, US Bank required Ash repay the loan, because no deed of trust had been recorded to secure it. Ash was not receiving income from the property and had to borrow money from his mother. He hired an attorney to represent his interests in the bankruptcy and try to get his money released in order to complete the transaction. The bankruptcy court eventually released Ash's funds in January 2010. With the funds and a

new loan at a higher interest rate from Wells Fargo, escrow closed in March 2010. However, the tax-deferred exchange was not completed within the time allowed and Ash had to pay significant taxes on his gain from the sale of the Wilshire property.

Ash sustained direct damages totaling $1,033,000 as a result of the failure to meet the escrow deadline, including his tax exposure, the interest that he paid on the US Bank loan, the increased interest rate on the Wells Fargo loan, and his attorney fees to obtain his funds from the bankrupt estate.

## II. Legal Proceedings

On April 13, 2009, Ash filed a complaint against Lerner for breach of the purchase agreement and against NAT for breach of the escrow instructions and breach of fiduciary duty. On March 2, 2010, Ash filed an amended complaint, adding a cause of action against NAT for negligence.

A jury trial began on July 20, 2011. Ash's escrow expert Vickie Crestani explained that although LandAmerica's bankruptcy was unusual, it was not the first time in her history of working with qualified intermediaries that an intermediary had declared bankruptcy. Crestani was disturbed to hear that LandAmerica had closed its doors, but could not say that she was surprised. There had been rumors among LandAmerica employees that LandAmerica would fold up and close its doors. Crestani could not say whether these rumors were generally known by people in the real estate industry in Southern California.

Crestani testified that Jennings had a fiduciary duty to follow Ash's instructions to obtain his funds. Jennings failed to secure the funds from Ash's qualified intermediary when he requested them, which she should have done even if escrow was going to be delayed by a day or two.

In addition, the escrow instructions did not allow Lerner to encumber the property before escrow closed. When Jennings received information that constituted a material change to the escrow, she needed to immediately advise Ash of the seller's intentions to

8

encumber the property and give Ash the opportunity to work out his options. NAT and Jennings accommodated Lerner and assisted in the delay of escrow closing, rather than closing the transaction.

Ash had completed everything that he needed to do to close the transaction. According to Crestani, when Jennings accepted loan proceeds from US Bank, she should have communicated with Ash that she would not be able to record the transaction and did not have his funds from LandAmerica. She should have gone over his options, including returning the loan proceeds, obtaining the funds from LandAmerica, or investing Ash's funds in commercial paper or an interest-bearing account.

Ash's accountant testified that when the section 1031 exchange failed, Ash's tax liability included $465,000 attributable to the Venice property transaction. Ash's damages expert Winston Elton testified that as a result of the failure to close escrow on time, Ash suffered the following damages: $166,000 of lost income from the property which Lerner collected instead; the additional tax liability of $465,000; legal costs of $140,000; payments and fees on the US Bank loan totaling $42,000; interest of $28,000 on a loan from his mother; and an additional $189,000 for the new loan from Wells Fargo. Therefore, the total amount of Ash's direct damages was $1,033,000.

During closing arguments, Ash argued that LandAmerica's bankruptcy was the elephant in the room, but Lerner and NAT invited the elephant in by shirking their obligations to meet the escrow deadline. Lerner had breached the purchase agreement by recording deeds of trust that changed the title and failing to deliver title by the escrow deadline. NAT breached its agreement with Ash by failing to request Ash's funds from LandAmerica and breached fiduciary duties by failing to act on Ash's behalf. Specifically, NAT failed to follow Ash's instructions to get his funds from LandAmerica, concealed information about the delay and entered into a side agreement with Lerner to record third party deeds of trust. NAT was negligent because Jennings failed to properly determine the property owners at the outset of escrow, did not timely send out documents, ignored the escrow deadline, and did not disclose conflicts to Ash. Ash

9

sought four categories of damages totaling approximately one million dollars: the taxes incurred, lost profits, legal costs from the bankruptcy, and his costs related to the loans.

In Lerner's closing argument, Lerner argued that a section 1031 exchange is not tax forgiveness, but simply tax deferral, so it was pure speculation as to what Ash's tax liability would have ultimately been. In addition, Ash was seeking duplicative damages by asking for lost income as well as the payments made on the loans to acquire the property. Lerner noted that everyone was shocked when LandAmerica went into bankruptcy, and ultimately, it was LandAmerica that took Ash's money.

NAT also argued that LandAmerica's bankruptcy was an unforeseeable and extraordinary event. No one had expected or foreseen that it was going to happen. Escrow did not close on Monday, November 24, 2008, or later, because LandAmerica closed its doors, which was not caused by NAT or Lerner. Ash could not blame NAT that the bankruptcy judge refused to disburse funds held by LandAmerica.

On August 2, 2011, the jury returned its verdict. The jury found NAT breached its contract with Ash. All the conditions occurred that were required for NAT's performance. NAT failed to act as required under the contract and Ash was harmed. The total damages attributable to NAT for breach of contract were $250,000. NAT also breached a fiduciary duty owed to Ash, which caused damages of $250,000. In addition, the jury found that NAT was negligent, which was a substantial factor in causing harm to Ash, and attributed damages of $500,000 to NAT for negligence. Moreover, the jury found that NAT acted with malice, oppression, or fraud, and a managing agent of NAT authorized the conduct. Therefore, the jury also awarded punitive damages of $750,000 against NAT.

As against Lerner, the jury found that Lerner entered into a contract to sell commercial real property to Ash, and Ash had substantially performed under the agreement. Lerner failed to act as the contract required and Ash was harmed as a result. The jury attributed $300,000 of Ash's damages to Lerner's breach of the purchase agreement.

On September 19, 2011, the trial court entered judgment against NAT in the amount of $1,750,000 and against Lerner in the amount of $300,000. Lerner and NAT filed motions for new trial and judgment notwithstanding the verdict, while Ash filed a motion seeking attorney and expert fees from Lerner and NAT. The court granted NAT's motion for judgment notwithstanding the verdict as to the claim for punitive damages and otherwise denied the motions. On November 8, 2011, the court entered an amended judgment.

## DISCUSSION

### Standard of Review

"'When findings of fact are challenged on appeal, we are bound by the familiar and highly deferential substantial evidence standard of review. This standard calls for review of the entire record to determine whether there is any substantial evidence, contradicted or not contradicted, to support the findings below. We view the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor.' (*People ex rel. Brown v. Tri–Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567.)" (*Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1128-1129.)

### Foreseeability of Contract Damages

The majority accepts the contention of Lerner and NAT that Ash's damages were unforeseeable as a matter of law and there is no substantial evidence to support the jury's finding that the damages were foreseeable. I disagree.

"Damages awarded to an injured party for breach of contract 'seek to approximate the agreed-upon performance.' [Citation.] The goal is to put the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the

11

contract. [Citation.] In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain. [Citation.]" (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 967-968 (*Lewis*).)

There are two types of contractual damages: "general damages (sometimes called direct damages) and special damages (sometimes called consequential damages)." (*Lewis, supra,* 34 Cal.4th at p. 968.) General damages are "those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach. (Civ. Code, § 3300 [damages 'which, in the ordinary course of things, would be likely to result' from breach]; *Mitchell v. Clarke* (1886) 71 Cal. 163, 167-168 [general damages are those that naturally and necessarily result from breach].) Because general damages are a natural and necessary consequence of a contract breach, they are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are 'deemed' to have contemplated them. (Calamari & Perillo, The Law of Contracts (2d ed. 1977) § 14-5, p. 525; *Hunt Bros. Co. v. San Lorenzo Water Co.* (1906) 150 Cal. 51, 56 [parties need not 'actually have contemplated the very consequence that occurred,' but they would have supposed such a consequence was likely to follow a breach].)" (*Lewis, supra,* 34 Cal.4th at p. 968.)

Special damages "are those losses that do not arise directly and inevitably from any similar breach of any similar agreement. Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties. Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test). [Citations.] Special damages 'will not be presumed from the mere breach' but represent loss that 'occurred by reason of injuries following from' the breach. [Citation.] Special damages are among the losses that are foreseeable and proximately caused by the breach of a contract. [Citation.]" (*Lewis, supra,* 34 Cal.4th at pp. 968-969.)

12

"Contract damages, unlike damages in tort (Civ. Code, § 3333), do not permit recovery for unanticipated injury.  [Citation.]  Parties may voluntarily assume the risk of liability for unusual losses, but to do so they must be told, at the time the contract is made, of any special harm likely to result from a breach [citations].  Alternatively, the nature of the contract or the circumstances in which it is made may compel the inference that the defendant should have contemplated the fact that such a loss would be 'the probable result' of the defendant's breach.  [Citation.]  Not recoverable as special damages are those 'beyond the expectations of the parties.'  [Citation.]  Special damages for breach of contract are limited to losses that were either actually foreseen (see, e.g., *Dallman Co. v. Southern Heater Co.* (1968) 262 Cal.App.2d 582, 586 [in contract negotiations, supplier was put on notice that its failure to perform would result in lost profits]) or were 'reasonably foreseeable' when the contract was formed.  [Citation.]"  (*Lewis, supra,* 34 Cal.4th at pp. 969-970.)

Ash testified that just before the parties entered their transaction, the most well-known intermediary closed its doors due to Washington Mutual's bankruptcy.  Ash developed concerns about the financial viability of LandAmerica, and he told Jennings that he was anxious to have his money safely reinvested in the property.  In other words, Ash communicated his fear to NAT that his funds were not safe with the intermediary.  The extent of Ash's concern was underscored by the fact that he had LandAmerica transfer a significant portion of his funds into escrow early.

The jury understood Ash's testimony about the collapse of the banking system and the state of the industry referred to the economic crisis of 2008, the worst financial crisis in the United States since the Great Depression.  (Brian R. Cheffins, *Did Corporate Governance "Fail" During the 2008 Stock Market Meltdown?  The Case of the S&P 500* (2009) 65 Bus. Law. 1, 1-2.)  Venerable investment bank Bear Sterns was an early casualty of the financial crisis in March 2008.  (Financial Crisis Inquiry Report, Pub.L. No. 111-21 (Jan. 2011) pp. 289-291, available at http://fcic.law.stanford.edu/report (Financial Crisis Report).)  From there, financial market conditions deteriorated rapidly

in the late summer and early fall of 2008.  (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 786.)

On September 7, 2008, the federal government placed two iconic mortgage institutions, the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), into conservatorship.  (Financial Crisis Report, *supra*, Pub.L. No. 111-21 at p. 309.)  Investment bank Lehman Brothers declared bankruptcy on September 15, 2008, and American International Group, Inc. (AIG) failed as well.  (*Id*. at p. 353.)  Investors began pulling deposits out of strong banks far removed from the businesses at the center of the crisis.  (*Id*. at pp. 353-354.)  In a span of eight days, depositors withdrew $16.7 billion from Washington Mutual.  (*Id*. at p. 365.)  On September 25, 2008, the Office of Thrift Supervision (OTS) issued an order closing Washington Mutual and appointing the Federal Deposit Insurance Corporation (FDIC) as receiver.  (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 879, citing U.S. Dept. of the Treasury, Office of Thrift Supervision Order No. 2008-36 (Sep. 25, 2008); 12 U.S.C. § 1821(c).)  Washington Mutual's collapse was the largest bank failure in United States history.  (Douglas W. Arner, Michael A. Panton and Paul Lejot, *Central Banks and Central Bank Cooperation in the Global Financial System* (2010) 23 Pacific McGeorge Global Bus. & Dev. L.J. 1, 23.)

On October 8, 2008, in the midst of the economic crisis, Ash and Lerner entered into their purchase agreement.  The Financial Crisis Report described the economic climate at that time:  "as massive losses spread throughout the financial system in the fall of 2008, many institutions failed, or would have failed but for government bailouts.  As panic gripped the market, credit markets seized up, trading ground to a halt, and the stock market plunged."  (Financial Crisis Report, *supra*, Pub.L. No. 111-21 at p. 386.)

The jury was entitled to interpret the evidence in light of common human experience and matters of common knowledge.  (*Gottloeb v. Melrose Health Baths* (1957) 148 Cal.App.2d 313, 317.)  The economic crisis of 2008 had a significant impact on American lives.  (Stavros Gadinis, *From Independence to Politics in Financial Regulation* (2013) 101 Cal. L. Rev. 327, 350.)  "Dramatic government initiatives and

14

violent market reactions kept the crisis in daily headlines. The eleventh-hour bailouts of Bear Stearns, Merrill Lynch, and AIG, and Lehman's spectacular collapse, increased the salience of the issue and the visibility of the main actors. In a 2008 poll on the then-evolving financial crisis, an impressive 84 percent of respondents stated that they pay at least some attention to reports about failing financial institutions such as Lehman, AIG, and Washington Mutual, with 57 percent stating that they pay a lot of attention." (*Id.* at pp. 350-351, fn. omitted.) "Although the national and state economies already were in dire straits [in September 2008], shortly thereafter the economy further deteriorated dramatically in light of the financial credit crisis and the resulting stock market collapse in October 2008 and a sharp decline in real estate values and consumer spending." (*Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1001.)

The economic crisis that gripped the United States in 2008 and the risk of bankruptcy were not particular to LandAmerica. The conditions created a foreseeable risk in any similar agreement at that time. Ash's damages from the delay in closing escrow were general damages, not special damages. It was sufficiently predictable at the time that the parties entered into their agreement that if NAT failed to obtain Ash's funds and left them with the intermediary, NAT gambled on whether LandAmerica would be the next financial institution to fail. Larger, established institutions collapsed before the parties even entered their agreement. Richard was as sophisticated an investor as Ash, if not more so. If escrow failed to close on time, it was certainly predictable to Lerner that Ash would lose income from the property and might have to arrange a new loan on less favorable terms. Whether the bankruptcy and damages resulting from delay were foreseeable to the parties at the time of contracting were factual issues for the jury to determine. The jury heard the evidence and found the damages were foreseeable, and I would conclude from the above that the jury's findings are supported by substantial evidence.

I agree with the majority that a superseding cause instruction was warranted in connection with the tort causes of action against NAT. However, NAT fully argued that

15

LandAmerica's bankruptcy was an unforeseeable event and the cause of Ash's damages. The breach of contract instructions required the jury to find that either the harm was likely to arise in the ordinary course of events from the breach, or both parties could reasonably have foreseen the harm as a probable result of the breach when the contract was made. The jury not only awarded contract damages against NAT, but they awarded the entire amount of Ash's damages and found punitive damages were warranted as well. Based on the arguments and the jury's findings, I do not believe it is reasonably probable that the jury would have reached a different result had they been given a superseding cause instruction as to a few of the claims.

KRIEGLER, J.